IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DISTRICT

|  |  |  |
|---|---|---|
| INTERNATIONAL EQUIPMENT TRADING, LTD., | ) ) ) | |
| | ) | No. 13 C 1129 |
| Plaintiff, | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| AB SCIEX LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION ORDER

Plaintiff International Equipment Trading, Ltd. ("IET") filed a six-count complaint against Defendant AB Sciex LLC asserting claims for alleged violations of federal antitrust law, state antitrust law, the Illinois Consumer Fraud Act, the Illinois Deceptive Trade Practices Act as well as a claim for tortious interference with IET's prospective economic advantage. AB Sciex moved to dismiss these claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

The following facts are taken from the complaint and are assumed to be true for purposes of this Motion to Dismiss. *See Voelker v. Porsche Cars North America, Inc.,* 353 F.3d 516, 520 (7th Cir. 2003); *Murphy v. Walker,* 51 F.3d 714, 717 (7th Cir. 1995). IET is an Illinois corporation with its principal place of business in Vernon Hills, Illinois. Its customers are located throughout the United States and abroad. IET sources new and pre-owned medical laboratory equipment for sale, lease, rent or trade to independent laboratories, hospitals, research

institutions and universities. *See* Complaint, Docket No. 1 at ¶ 2. The laboratory equipment sourced by IET includes mass spectrometry systems manufactured by AB Sciex. *Id.* Mass spectrometers are sophisticated instruments used by researchers, clinicians and scientists in the biotechnology, biomedical and pharmaceutical fields. *Id.* The instruments are generally used in the research and development of new pharmaceutical drugs. *Id.* They are also used in conjunction with food and environmental safety testing. *Id.*

In addition to manufacturing and selling new mass spectrometers, AB Sciex is also in the business of selling its pre-owned mass spectrometers. *Id.* at ¶ 3. As a result, AB Sciex and IET are competitors. *Id.* There are fewer than ten companies in the United States and Canada who sell AB Sciex's mass spectrometers on the secondary market. *Id.* at ¶ 24. AB Sciex is also one of only five companies who manufacture mass spectrometers. *Id.* at ¶ 23.

The use of operating and data collection software is necessary to operate the mass spectrometers produced by AB Sciex. *Id.* at ¶ 4. AB Sciex possesses a copyright to the operating and data collection software. *Id.* Therefore, to operate an AB Sciex mass spectrometer, a user must obtain a license to the software. *Id.* The licenses are not transferrable. *Id.* As a result, if a customer purchases an AB Sciex mass spectrometer on the secondary market, they must still obtain a license from the AB Sciex to use the software. *Id.* Beginning in or around April 2008, AB Sciex instituted a practice of informing customers who intended to purchase a mass spectrometer on the secondary market from an independent retailer, such as IET, that they would be charged a $40,000 "site licensing fee" for the operating and data collection software. *Id.* However, the customer would not have to pay the $40,000 fee if they purchased a refurbished mass spectrometer directly from AB Sciex. *Id.*

AB Sciex has never actually imposed the $40,000 "site licensing fee" on any purchaser. *Id.* at ¶ 5. The amount of the fee and the decision to charge it falls within the complete discretion of AB Sciex's regional sales representatives or service engineers. *Id.* AB Sciex generally charges only between $2,500 and $4,000 for a site license. *Id.* IET contends that the $40,000 site licensing fee is a "scare tactic" used by AB Sciex to destroy competition and build a monopoly within the secondary market over its own mass spectrometers. *Id.* at ¶ 6.

Specifically, IET contends that AB Sciex's competitors are disadvantaged and likely to lose sales because potential customers would either: (1) purchase a new mass spectrometer instead of paying for a refurbished spectrometer plus the site license fee; (2) purchase the refurbished mass spectrometer directly from AB Sciex to avoid the fee; or (3) purchase a mass spectrometer manufactured by a different company, which would cause IET and other resellers to be forced to retain inventory. *Id.* at ¶ 25. To the extent that IET or another reseller could maintain a sale in the face of this threat, IET's profit margins would be significantly reduced because IET is forced to reduce the purchase price in the amount of the threatened fee. *Id.* at ¶ 6. IET contends that AB Sciex's conduct has caused it to lose over $2 million in sales revenue since 2010. *Id.* at ¶¶ 14-16. While, according to IET, AB Sciex has threatened customers located in other states and foreign countries, AB Sciex has interfered with three mass spectrometer sales to customers located in Illinois. *Id.* at ¶¶ 15-16.

As a result of AB Sciex's alleged conduct, IET filed the instant complaint on February 11, 2013. IET claims that AB Sciex's conduct amounts to attempted monopolization within a market for refurbished mass spectrometers manufactured by AB Sciex in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and Section 10/3(a)(3) of the Illinois Antitrust Act, 740 ILCS 10/3(a)(3). IET also alleges

that AB Sciex violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.,* and the Illinois Deceptive Trade Practices Act, 816 ILCS 510/1 *et seq.* Finally, IET pleads an Illinois common law claim for intentional interference with IET's prospective economic advantage. AB Sciex has moved to dismiss the complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

**STANDARD OF REVIEW**

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts as true all facts alleged in the complaint and construe all reasonable inferences in favor of the plaintiff. *See Murphy,* 51 F.3d at 717. To state a claim upon which relief may be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief". Fed. R. Civ. P. 8(a)(2). "Detailed factual allegations are not required, but the plaintiff must allege facts that when "accepted as true . . . 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 120 S. Ct. 1937, 1949 (2009) (*quoting Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). For complaints involving complex litigation, like this antitrust case, a fuller set of factual allegations may be necessary to show that plaintiff's claims are plausible. *See Limestone Development Corp., v. Village of Lemont, Ill.,* 520 F.3d 797, 803 (7th Cir. 2008); *see also, e.g., DSM Desotech Inc. v. 3D Systems Corp.,* No. 08 C 1531, 2009 WL 174989, at *3 (N.D. Ill. Jan. 26, 2009). In analyzing whether a complaint meets this standard, the "reviewing court [must] draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950. When there are well-pleaded factual allegations, the Court assumes their veracity then determines if they plausibly give rise to an entitlement to relief. *Id.*

# DISCUSSION

## I.     The Attempted Monopolization Claims

Section 2 of the Sherman Act provides in relevant part that "[e]very person who shall . . . attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . ."  15 U.S.C. § 2.  To prove attempted monopolization, a plaintiff must establish: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993); *accord Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1412 (7th Cir. 1989); *National Black Exp v. Clear Channel Broadcasting, Inc.,* No. 03 C 2751, 2007 WL 495307, at *8 (N.D. Ill. Feb. 8, 2007); *DSM Desotech,* 2009 WL 1744989, at *6.  AB Sciex does not contest, and thus concedes, that IET sufficiently alleged that it acted with a specific intent to monopolize but argues that IET has failed to sufficiently allege both a dangerous probability of achieving monopoly power and predatory conduct.[1]

### A.     Dangerous Probability of Success

In order to establish the "dangerous probability" prong, IET must plead that AB Sciex had sufficient market power to threaten actual monopolization within the relevant market.  *See Indiana Grocery,* 864 F.2d at 1413; *see also Spectrum Sports,* 506 U.S. at 455 (holding that an antitrust plaintiff must provide a "definition of the relevant market and examination of market

---

[1] Sections 4 and 16 of the Clayton Act establish a private right of action for a violation of Section 2 of the Sherman Act.  Thus the Clayton Act claim will stand or fall with the Sherman Act claim.   Similarly, Illinois law directs a district court to "use the construction of the federal law by the federal courts as a guide in construing [the Illinois Antitrust Act]" when "the wording [of the Act] is identical or similar to that of federal antitrust law."  740 ILCS 10/11.  Therefore, the Illinois Antitrust Act claim will stand or fall with the Sherman Act claim as well.  *See, e.g., DSM Desotech,* 2009 WL 1744989, at *12 ("Because Desotech has stated valid claims for attempted monopolization under section 2 of the Sherman Act . . . Desotech has likewise stated a valid claim under 740 Ill. Comp. Stat. 10/3.").

power.").  IET's claims fail in this case because its Complaint fails to adequately define the relevant market.

A relevant market for purposes of § 2 of the Sherman Act is a market defined by the reasonable interchangeability of the products and the cross-elasticity of demand for those products.  *See United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 394-95 (1956); *see also, e.g., In re: Dairy Farmers of America, Inc.,* 767 F. Supp. 2d 880, 901 (N.D. Ill. 2011); *Chapman v. N.Y. Div. for Youth,* 546 F.3d 230, 237 (2d Cir. 2008) (quoting *Todd v. Exxon Corp.,* 275 F.3d 191, 200 (2d Cir. 2001)) ("For a monopoly claim 'to survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes – analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible.'").  This means that "the products in a market must have unique attributes that allow them to be substituted for one another, but make them difficult to replace with substitute products from outside the market."  *Dairy Farmers,* 767 F. Supp. 2d at 901 (citing *Todd,* 275 F.3d at 201-02).

Courts are generally hesitant to dismiss a Sherman Act claim for failure to allege a relevant product "[b]ecause market definition is a deeply fact-intensive inquiry."  *Todd,* 275 F.3d at 199-200; *see also, e.g., Dairy Farmers,* 767 F. Supp. 2d at 901; *Desotech,* 2009 WL 174989, at *8.  However, this hesitancy does not mean that a court should blindly accept a market definition proposed in a complaint.  Indeed, courts should dismiss a claim when "the alleged relevant market 'clearly does not encompass all interchangeable substitute products' or when a plaintiff 'fails even to attempt a plausible explanation as to why a market should be limited in a particular way.'"  *Dairy Farmers,* 767 F. Supp. 2d at 901 (citing *Conte v. Newsday, Inc.,* 703 F. Supp. 2d 126, 142 (E.D.N.Y. 2010)); *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*

124 F.3d 430, 436 (3d Cir. 1997) ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted."); *Chapman,* 546 F.3d at 238 (same); *see also, e.g., Emigra Group, LLC v. Gramgomen, Del Rey, Bernsen & Loewry, LLP,* 612 F. Supp. 2d 330, 359 (S.D.N.Y. 2009) ("[I]n a case that requires proof of a relevant market, it is not enough to survive even a Rule 12(b)(6) motion to dismiss to make bald assertions as to its existence or definition.").

When a complaint limits the relevant market to a "single brand, franchise, institution, or comparable entity that competes with potential substitutes," a court should dismiss the complaint unless the complaint contains sufficient factual allegations that make it plausible there is no substitute. *Todd,* 275 F.3d at 200; *see also Hack v. President & Fellows of Yale College,* 237 F. 3d 81, 86-87 (2d. Cir. 2000) (holding that Yale University competes with other schools and thus is not its own product market); *Tanaka v. University of Southern California,* 252 F.3d 1059, 1063-64 (9th Cir. 2001) (holding that the UCLA women's soccer program does not constitute its own market because other college programs compete to recruit student-athletes); *Queen City,* 124 F.3d at 438 (holding that a market cannot be limited to products approved by Domino's pizza for Domino's stores); *Rohlfing v. Manor Care,* 172 F.R.D. 330, 345-46 (N.D. Ill. 1997) (dismissing claim for a violation of Section 2 of the Sherman Act because plaintiff failed to sufficiently allege a relevant market).

Here, IET defines the relevant market as mass spectrometers manufactured by AB Sciex that are sold or leased on the secondary market. However, IET fails to allege any facts to support

this narrow product market definition. IET has not pleaded facts demonstrating that AB Sciex's mass spectrometers are unique and cannot be substituted with other manufacturer's spectrometers. There are also no allegations regarding cross-elasticities of supply or demand. In fact, IET's Complaint contradicts its narrow market definition. The Complaint alleges that there are four other competing manufacturers of mass spectrometry systems. Doc. 1 at ¶ 6. The Complaint further alleges that mass spectrometers produced by these competing manufacturers are sold and leased on the secondary market and are competitive alternatives to AB Sciex mass spectrometers sold on the secondary market. *See id.* at ¶ 25 ("[A] customer looking to purchase a refurbished AB Sciex mass spectrometry instrument facing the threat of AB Sciex imposing the licensing fee will decline to assume that risk by either: (a) purchasing directly from AB Sciex, or (b) purchasing a mass spectrometer manufactured by a different company . . . ." As a result, the Complaint fails to sufficiently allege a relevant market for purposes of sustaining the Sherman Act claim.

IET's argument to the contrary is unpersuasive. IET argues that under the Supreme Court's holding in *Eastman Kodak Co. v. Image Technical Services, Inc.,* it is allowed to limit the relevant market to a single brand of a product. This argument misses the point. There is no dispute that a relevant market can be limited to a single brand; rather, the question is whether the plaintiff adequately alleged that there are no interchangeable substitutes to that a single brand. *Kodak* recognized this distinction. There, the Supreme Court held that:

> The relevant market for antitrust purposes are determined by the choices available to Kodak equipment owners. Because *service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts,* the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines.

*Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 481-92 (1992) (emphasis added). Conversely here it appears that there are substitute products for AB Sciex's mass spectrometers because, as the Complaint concedes, a potential customer faced with paying the $40,000 site license fee could "purchase a mass spectrometer manufactured by a different company." Doc. 1 at ¶ 25. Therefore, since IET failed to plausibly allege that there are no products that are interchangeable with AB Sciex's mass spectrometers, these claims must be dismissed. Since the Court holds that IET has failed to sufficiently allege a relevant market, it will not, and cannot, address whether IET has sufficiently alleged market power for purposes of pleading a dangerous probability of monopolization.

**B.      Predatory and Anti-Competitive Conduct**

The Court, however, will address whether the Complaint alleges the predatory and anti-competitive conduct prong sufficiently so that any deficiencies can be addressed in an amended pleading. The Supreme Court has characterized predatory and anti-competitive conduct as "the use of monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *Eastman Kodak,* 504 U.S. at 482-83 (quoting *United States v. Griffith,* 334 U.S. 100, 107 (1948)); *see also Great Escape, Inc. v. Union City Body Co.,* 791 F.2d 532, 541 (7th Cir. 1986) (defining anti-competitive conduct as "conduct that is in itself an independent violation of the antitrust laws or that has no legitimate business justification other than to destroy or damage competition."). However, the Seventh Circuit has cautioned that "if conduct is not objectively anticompetitive the fact that it was motivated by hostility to competitors . . . is irrelevant." *Olympia Equip. Leasing Co. v. Western Union Tel. Co.,* 797 F.2d 370, 379 (7th Cir. 1986) (citing *Ball Mem'l Hosp. v. Mut. Hosp. Ins., Inc.,* 784 F.2d 1325, 1338-39 (7th Cir. 1986)). The "anti-competitive conduct criterion captures the critical antitrust idea of harm to

competition, rather than to competitors." *Spanish Broad Sys. of Fla., Inc. v. Clear Channel Communications, Inc.,* 376 F.3d 1065, 1075 (11th Cir. 2004). Indeed, conduct that merely injures an individual firm, and not competition in the marketplace, does not violate Section 2 of the Sherman Act. *See id.; see also McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 812-13 (9th Cir. 1988) ("It is injury to the market or to competition in general, not merely injury to individuals or individual firms that is significant."). "Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 225 (1993).

IET identifies two distinct types of conduct that it contends were predatory or anti-competitive. First, IET argues that AB Sciex engaged in predatory and anti-competitive conduct by falsely representing to potential customers that they would be required to pay the $40,000 site license fee if they purchased a refurbished AB Sciex mass spectrometer from IET. Second, AB Sciex engaged in predatory pricing because it sacrificed greater profits by reducing or waiving the licensing fees charged to its own customers. However, as currently pleaded, neither of these alleged acts can be considered predatory or anti-competitive for purposes of establishing liability under the Sherman Act.

### 1.    The Alleged Misrepresentation

IET argues that AB Sciex's "threat" to impose the $40,000 site license fee was a false statement because: (1) the first sales doctrine prohibited AB Sciex from imposing the fee; (2) AB Sciex was contractually prohibited from imposing the fee in certain instances; and (3) to the extent AB Sciex possessed the right to charge the fee, it never did so in practice.

**The Complaint Fails to Establish the Applicability of the First Sale Doctrine**

The first sale doctrine permits the purchaser of a copyright to transfer the protected copy of a work without the permission of the copyright owner. *See Quality King Distributions, Inc. v. L'Anza Research International,* 523 U.S. 135, 140-43 (1998); 17 U.S.C. § 109(a) ("the owner of a particular copy . . . lawfully made under this title . . . is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy . . . ."). However, if the copyrighted work is not sold, the copyright holder does not lose his right to control the distribution of that work. Thus, where a copyright holder only licensed and did not sell its copyrighted software, the first sale doctrine has no application as a matter of law. *See* 17 U.S.C. § 109(d) ("The privileges prescribed by subsections (a) and (c) do not, unless authorized by the copyright owner, extend to any person who has acquired possession of the copy or phonorecord from the copyright owner, by rental, lease, loan, or otherwise, without acquiring ownership of it."); *see also, e.g., Vernor v. Autodesk, Inc.,* 621 F.3d 1102, 1111 (9th Cir. 2010) (holding that when the software user is a licensee, the software user is not entitled to invoke the first sale doctrine); *Apple Inc. v. Psystar Corp.,* 658 F.3d 1150, 1155 (9th Cir. 2011) ("[T]he first sale doctrine does not apply to a licensee."); *Monsanto Co. v. Scruggs,* 459 F.3d 1328 1336 (Fed. Cir. 2006) (holding the first sale doctrine only applies to an unconditional sale but not to an expressly conditional sale or license); *Isc-Bunker Ramo Corp. v. Altech, Inc.,* 765 F. Supp. 1310, 1331 (N.D. Ill. 1990) ("[G]iven the substantial evidence that ISC only licensed and did not sell its copyrighted software, the first sale doctrine has no application . . . as a matter of law.").

Here, the Complaint affirmatively concedes that AB Sciex licensed the software used in its mass spectrometers to its customers. *See* Doc. 1 at ¶ 4 (stating that AB Sciex learns of IET's potential sales when customers contact them with a "licensing inquiry"); ¶ 5 (noting that the

"amount of the [licensing] fee, or whether to charge it at all, is completely discretionary on the part of AB Sciex's regional sales representative or service engineer"); ¶ 6 (noting that in contrast to AB Sciex, other manufacturers of mass spectrometry systems "sell the software along with their systems"); ¶ 14 (noting that AB Sciex had consented to the transfer of the software licenses loaded on the mass spectrometers); ¶ 21 (noting that the amount of the licensing fee AB Sciex may charge "is within the discretion of the local salesperson."). Since the allegations in the Complaint establish that AB Sciex licensed its software to purchasers, the first sale doctrine is inapplicable. Thus, the first sale doctrine cannot serve as basis to infer that the statements AB Sciex made to IET's potential customers were false, predatory or anti-competitive.

### b. The Illusory $40,000 Licensing Fee

IET also contends that even if the first sales doctrine is inapplicable, AB Sciex's "threat" to impose the $40,000 licensing fee constitutes a misrepresentation because the $40,000 licensing fee was "illusory" in light of AB Sciex's practice to only charge a nominal licensing fee. In other words, according to IET, AB Sciex made a false representation by informing potential purchasers that the licensing fee was mandatory when in fact it was discretionary. Similarly, IET contends that in certain cases AB Sciex threatened to impose the site license fee where it was contractually prohibited from imposing any licensing fee.[2] In these cases, AB Sciex made a false representation by threating customers with the fee when they had no ability to

---

[2] Specifically, the Complaint alleges that AB Sciex entered into a "Consent to Transfer and Assignment of Licenses to Certain AB Software" letter agreement with De Lage Landen Financial Services, Inc. ("DLL'). Under the agreement DLL purchased AB Sciex mass spectrometers. DLL would then lease these instruments to consumers. It also would provide financing services to consumers who wished to purchase an AB Sciex instrument. When a lease term ended, DLL would then sell the used instrument on the secondary market. It often engaged third party sellers, like IET, to handle these sales. Under the letter agreement, a reseller engaged by DLL was permitted to sell an AB Sciex mass spectrometer to a customer with the software license loaded onto the spectrometer. In other words, AB Sciex was contractually prohibited from charging a licensing fee to customers who purchased from IET provided that IET was selling a mass spectrometer on behalf of DLL. Despite the exemption, AB Sciex threatened to impose the site license fee in connection with two potential sales by IET.

impose the fee.  However, even crediting these statements as true as the Court must at this stage of the litigation, these alleged misrepresentations are insufficient to establish predatory or anticompetitive conduct.

Misrepresentations are generally not actionable under the antitrust statutes.  *See Sanderson v. Culligan International Co.,* 415 F.3d 620, 624 (7th Cir. 2005); *Mercatus v. Lake Forest Hospital,* 641 F. 3d 834, 850-51 (7th Cir. 2011) ("absent an accompanying coercive enforcement mechanism of some kind, even demonstrably false commercial speech is not actionable under the antitrust laws.") (internal citations and quotations omitted); *Schachar v. American Academy of Opthalmology, Inc.,* 870 F.2d 397, 400 (7th Cir. 1989) (noting that, whenever one competitor's statements about another are "false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech – the marketplace of ideas").  Indeed, other circuits have concluded that false speech does not violate the antitrust laws because the anticompetitive effects of false speech are minimal.  *See, e.g., American Council of Certified Podiatric Physicians & Surgeons v. American Bd. of Podiatric Surgery, Inc.,* 323 F.3d 366, 370 (6th Cir. 2003); *National Association of Pharmaceutical Manufacturers v. Ayerst Labs.,* 850 F.2d 904, 916 (2d Cir. 1988); *Spanish Broad. Sys. of Fla.,* 376 F.3d at 1076-77 (finding that because misrepresentations only harmed a competitor and not competition, they were not actionable under the antitrust statutes).

For a misrepresentation to be actionable under the Sherman Act it must be combined with a coercive enforcement mechanism.  *See Mercatus Group,* 641 F.3d at 850-52; *Sanderson,* 415 F.3d at 624.  Examples of coercive mechanisms include the ability to boycott, the ability to enter into agreements not to distribute certain products or an inherent authority that can be used as leverage.  *See Mercatus Group,* 641 F.3d at 850-51; *Schachar,* 870 F.2d at 399.  "Enforcement

mechanisms are the 'restraints' of trade." *Schachar,* 870 F.2d at 399. In this case, the Complaint fails to identify any enforcement mechanism that would make the statements regarding the $40,000 licensing fee actionable under the Sherman Act. In other words, there are no factual allegations that explain how these alleged misrepresentations have harmed competition, rather than just IET. Indeed, the Complaint itself suggests that the misrepresentations have spurred competition in that both firms have lowered their prices in order to make the sale. *See* Doc. 1 at ¶ 6 ("This 'scare tactic' utilized by AB Sciex, insofar as it impacts IET's profits, has the effect of . . . forcing IET to reduce the purchase price in the amount of the threatened license fee in order to retain the sale."); ¶16(d) (stating that AB Sciex's threat "in connection with the sale of a 4000 QTRAP . . . resulted in IET's extension of a $50,000 price reduction to the customer to account for AB Sciex's threatened $40,000 site licensing fee").

Moreover, since IET has not established the relevant market can be limited to AB Sciex's mass spectrometers, the alleged misrepresentations do not appear to harm competition because, as the Complaint concedes, IET appears to be able to compete with AB Sciex by offering mass spectrometers to customers produced by other manufacturers that have no licensing fee attached to them. *See* Doc. 1 at ¶ 6 (noting that Agilent and Thermo Finnigan LLC "do not charge a site licensing free at all, and instead sell the software along with their systems"). Therefore, the Complaint fails to sufficiently allege that the threat of the licensing fee constitutes predatory or anticompetitive conduct for purposes of the Sherman Act.

### 2. Predatory Pricing

To establish a predatory pricing claim under Section 2, a plaintiff must show that: (1) the prices complained of were below an appropriate measure of the defendant's costs; and (2) the defendant had a dangerous probability of recouping its investment in below-cost prices. *See*

*Brooke Group,* 509 U.S. at 223-23; *see also Wallace v. IBM,* 467 F.3d 1104, 1106 (7th Cir. 2006) ("Predatory pricing is a three-stage process: Low prices, followed by the exit of producers who can no longer make a profit, followed by monopoly prices."); *see also, e.g., U.S. Futures Exchange, L.L.C. v. Board of Trade of the City of Chicago, Inc.,* No. 04 C 6756, 2010 WL 2679982, at *3 (N.D. Ill. July 2, 2010) ("To demonstrate that CBOT's prices were predatory, Plaintiffs must show that CBOT's reduced fees were below its costs and that CBOT had a reasonable prospect or dangerous probability of recouping its investment in below-cost pricing.") (internal citations and quotations omitted). Indeed, it is insufficient to merely show that a defendant lowered prices, even if the discounts or price reductions inflicted losses on the defendant's rivals. *See Brooke Group,* 509 U.S. at 223; *see also Astra Media Group, LLC v. Clear Channel Taxi Media,* 414 Fed. Appx. 334, 336 (2d Cir. 2011) (affirming dismissal of predatory pricing claim because plaintiff failed to plead that defendant's prices were below an appropriate measure of its costs.).

The Complaint here is devoid of any allegations about whether the prices quoted by AB Sciex were below its costs. Similarly, there are no allegations describing a dangerous probability that AB Sciex would recoup any losses from the alleged predatory pricing. Since these allegations are necessary prerequisites to establishing a predatory pricing claim, IET has failed to establish that the license waivers offered by AB Sciex amounts to predatory conduct.

IET's argument to the contrary is without merit. IET argues that because it alleged AB Sciex has willingly sacrificed greater profits in order to reduce competition, it has sufficiently alleged predatory pricing. This is an incorrect statement of the law. The Supreme Court in *Brooke Group* explicitly rejected this argument when it held that a predatory pricing claim cannot stand where a plaintiff merely shows that a defendant lowered prices and discounts or

price reductions inflicted losses on the defendant's rivals. *See Brooke Group,* 509 U.S. at 223; *see also, e.g., U.S. Futures Exchange,* 2010 WL 2679982, at *3 ("It is insufficient to merely show that a defendant lowered prices, even if price-cutting inflicts losses on its rivals."). Therefore, IET has failed to sufficiently allege AB Sciex's attempted monopolization through predatory pricing.

## II. The Illinois Consumer Fraud Act and Uniform Deceptive Trade Practices Act Claims

The Illinois Consumer Fraud Act "is a regulatory and remedial statute intended to protect consumers . . . against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Financial Services,* 536 F.3d 663, 669 (7th Cir. 2008) (quoting *Robinson v. Toyota Motor Credit Corp.,* 775 N.E.2d 951, 960 (Ill. 2002)). The ICFA provides in relevant part that:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby

815 ILCS 505/2. Illinois appellate courts have interpreted the statute to be disjunctive, allowing separate claims for unfair acts or practices and deceptive acts or practices. *See, e.g., Pappas v. Pella Corp.,* 844 N.E. 2d 995, 1002 (Ill. App. Ct. 2006). In determining whether alleged conduct is unfair under the ICFA, courts should consider: (1) whether practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; or (3) whether it causes substantial injury to consumers. *See Windy City,* 536 F.3d at 669 (internal citations and quotations omitted). Similarly, to establish that a deceptive act violated the ICFA, a plaintiff must prove: (1) a deceptive act or practice; (2) intent; (3) the deception occurred in the course of conduct involving

trade and commerce; (4) actual damages to the plaintiff; and (5) proximate cause. *See Cozzi Iron and Metal, Inc. v. U.S. Office Equipment, Inc.,* 250 F.3d 570, 576 (7th Cir. 2001); *Oliveira v. Amoco Oil Co.,* 776 N.E.2d 151, 160 (Ill. 2002).

AB Sciex contends that IET's ICFA and UDTPA claims should be dismissed because: (1) IET failed to allege the misrepresentation of a material fact; and (2) IET failed to establish that the conduct at issue occurred primarily and substantially in Illinois. Neither of these arguments have merit.

### A. Misrepresentation of Material Fact

To establish a claim for a violation of the ICFA based on alleged misrepresentation, the misrepresentation must have been of a material fact. *See* 815 ILCS 505/2; *see also Ryan v. Wersi Elec. GmbH & Co.,* 59 F.3d 52, 54 (7th Cir. 1995) (noting that a plaintiff is "required to show that the alleged misrepresentations were material and these misrepresentations proximately resulted in damages."). "A material fact is one in which 'a buyer would have acted differently knowing the information, or . . . concern[s] the type of information upon which a buyer would be expected to rely in making a decision whether to purchase.'" *Cozzi,* 250 F.3d at 576 (quoting *Connick v. Suzuki Motor Co., Ltd.,* 675 N.E. 2d 584, 593 (Ill. 2006)). This means "the fact 'must be essential to the transaction between the parties.'" *Id.* (quoting *Ryan,* 59 F.3d at 54).

The Complaint here alleges materiality sufficiently. The Complaint alleges that AB Sciex violated the ICFA and UDTPA by threatening IET's potential customers with an "illusory" $40,000 site licensing fee. This fee was "illusory" because in some instances AB Sciex was contractually prohibited from imposing any licensing fee and in the remainder of the cases, AB Sciex never intended to impose the fee. Finally, the Complaint alleges multiple lost sales where

the potential customer decided not to purchase from IET due to the threat of the "illusory" $40,000 site license fee. This is sufficient to allege materiality for purposes of these claims.

**B.   IET Sufficiently Alleged that the Conduct Occurred Primarily and Substantially in Illinois**

AB Sciex's second argument presents a closer question because the IFCA and UDTPA do not apply to fraudulent practices that take place outside of Illinois. *See Avery v. State Farm Mut. Auto. Ins. Co.,* 835 N.E.2d 801, 853 (2005); *Landau v. CNA Fin. Corp.,* 886 N.E.2d 405, 406 (Ill. App. Ct. 2008) ("The Consumer Fraud Act is a statute without extraterritorial effect . . . ."). Rather, a plaintiff may only pursue a claim under the Consumer Fraud Act "if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois." *Avery,* 835 N.E.2d at 853-54. Each case must be decided on its own facts; "there is no single formula or bright-line test for determining whether a transaction occurs within [Illinois]." *Id.* at 854. In determining whether the transaction occurred primarily and substantially in Illinois, a court may consider factors such as "the place of injury or deception, the location of the parties, the location where the relevant activities occurred, and the parties' contacts with Illinois." *Valley Air Serv. v. Southaire, Inc.,* No. 06 C 782, 2009 WL 1033556, at *12 (N.D. Ill. Apr. 16, 2009) (citing *Avery,* 835 N.E.2d at 853-55); *see also, e.g., The Clearing Corp. v. Fin. and Energy Exchange Ltd.,* No. 09 C 5383, 2010 WL 2836717, at *6 (N.D. Ill. July 16, 2010) (noting that the court in *Avery* considered the following factors: (1) the plaintiff's residence; (2) the defendant's place of business; (3) the location of the item that was the subject of the transaction; (4) the location of the plaintiff's contacts with the defendant; (5) where the contracts were executed; (6) the contracts' choice of law provision, if any; (7) where the deceptive statements were made; (8) where payments for services were sent; and (9) where complaints were to be directed).

Here, the Complaint alleges enough to sustain this claim at this stage. First, IET is an Illinois corporation with its principal place of business in Illinois. Second, it identifies three specific transactions where it had negotiated the potential sale of an AB Sciex mass spectrometer to a customer located in Illinois only to have AB Sciex "interfere" with the sale by threatening to impose the site license fee. AB Sciex contends these facts are insufficient to establish that the alleged deceptive conduct occurred primarily and substantially in Illinois when considered in conjunction with the facts that: (a) AB Sciex is not domiciled in Illinois; and (b) the customers in the other sixteen alleged lost sales were not located in Illinois. However, AB Sciex ignores a critical point. Despite the fact the customers were not located in Illinois, the damages from those lost sales still flowed to Illinois because IET was the party injured by AB Sciex's interference. Therefore, IET has sufficiently alleged that the conduct occurred primarily and substantially in Illinois for purposes of meeting the requirements of Federal Rule of Civil Procedure 8(a).

## III.    The Tortious Interference with Prospective Economic Advantage Claim

To prove a claim for tortious interference with a prospective economic advantage under Illinois law, a plaintiff must establish that: (1) there was a reasonable expectancy of entering into a valid business relationship; (2) the defendant had knowledge of the plaintiff's expectancy; (3) there was an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy; and (4) damages to the plaintiff as result. *See Borsellino v. Goldman Sachs Group, Inc.,* 477 F.3d 502, 508 (7th Cir. 2007); *Botvinick v. Rush Univ. Med. Ctr.,* 574 F.3d 414, 417 (7th Cir. 2009) (internal citations omitted). AB Sciex does not contest, and thus concedes, that IET has adequately alleged an expectancy, AB Sciex's knowledge of the expectancy and damages. However, AB Sciex argues that IET has failed to plead an unjustified interference. Not all interference with an economic expectancy is

unjustified. Indeed, the Restatement provides that there is no unlawful interference if: (1) the relation concerns a matter involved in competition between the parties; (2) the actor does not employ wrongful means; (3) the action does not create or continue an unlawful restraint of trade; and (4) the defendant's purpose is at least in part to advance its own interest in competing with the plaintiff. *See* Restatement (Second) of Torts § 768 (1979).

Since the Court must credit IET's allegations as true at this stage, the Court finds that IET has plead its intentional interference claim sufficiently. IET alleges that AB Sciex interfered with its potential sales by making false statements to potential customers regarding whether they would have to pay a $40,000 site license fee to AB Sciex if they purchased the mass spectrometer from IET. Making fraudulent statements to a competitor's customers does not constitute privileged lawful competition. *See Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.,* 882 N.E.2d 1011, 1019 (Ill. 2008) ("The privilege to compete does not, however, encompass the use of improper competitive strategies that employ fraud, deceit, intimidation, or deliberate disparagement.") (internal citations omitted); *see also, e.g., Quantum Foods v. Progressive Foods, Inc.,* No. 12 C 1329, 2012 WL 5520411, at *2 (N.D. Ill. Nov. 14, 2012) (finding that allegations that defendant made false statements about plaintiff are sufficient for purposes of pleading unjustified interference.). Therefore, IET has sufficiently alleged this claim at this stage.

## CONCLUSION

For the reasons set forth above, Defendant AB Sciex's motion to dismiss is granted in part and denied in part. Plaintiff IET's antitrust claims (Counts I, II and V) are dismissed without prejudice. The motion to dismiss the Illinois Consumer Fraud Act claim (Count III), the Illinois Uniform Deceptive Trades Practices Act claim (Count IV), and the tortious interference

with a prospective economic advantage claim (Count VI) is denied. If Plaintiff intends to amend its pleading, the amended complaint shall be filed within fourteen days of the entry of this Order.[3]

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: August 29, 2013

_____
[3] Regardless of whether IET is able to plead a federal antitrust claim eventually, the Court maintains subject matter jurisdiction over the action as IET's complaint established diversity of citizenship under 28 U.S.C. § 1332 for purposes of federal subject matter jurisdiction.

21