**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| INTERNATIONAL EQUIPMENT TRADING, LTD., an Illinois corporation, | ) ) ) | No. 1:13-cv-01129 |
| | ) | Honorable Virginia M. Kendall |
| Plaintiff, | ) ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| v. | ) ) | |
| AB SCIEX LLC, a Delaware limited liability Company, f/k/a APPLIED BIOSYSTEMS/MDS SCIEX, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**AMENDED ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANT AB**
**SCIEX TO PLAINTIFF'S AMENDED COMPLAINT**

Defendant AB Sciex LLC ("AB Sciex"), through undersigned counsel, hereby amends its answers to the Amended Complaint of International Equipment Trading, Ltd. ("IET" or "Plaintiff"). This Answer is based upon AB Sciex's knowledge to date, and AB Sciex reserves the right to amend it during the course of litigation as new information is learned. All allegations not specifically admitted are denied. To the extent that the headings set forth in the Amended Complaint may be construed as allegations requiring a response, AB Sciex denies all such allegations.

AB Sciex admits, denies, or otherwise responds as follows:

**NATURE OF ACTION**

**Paragraph No. 1**

This is an action brought pursuant to Section 2 of the Sherman Act, Sections 4 and 16 of the Clayton Act, and various state laws in order to enjoin and prevent Defendant AB Sciex LLC, f/k/a

1

Applied Biosystems/MDS Sciex ("AB Sciex") from continuing to engage in certain predatory and anticompetitive business practices directed against Plaintiff, International Equipment Trading, Ltd. ("IET") and other secondary resellers of AB Sciex's products. IET also seeks treble compensatory damages, including lost profits, suffered by it as a result of AB Sciex's unlawful and anticompetitive conduct.

**ANSWER:** The allegations in ¶ 1 contain IET's characterization of its own claims, to which no response is required. To the extent a response is required, AB Sciex denies the allegations in ¶ 1.

## Paragraph No. 2

IET is in the business of sourcing pre-owned and new analytical laboratory equipment for sale, lease, rent or trade to independent laboratories, hospitals, research institutions and universities, both within the United States, including the State of Illinois, and internationally. The laboratory equipment sourced by IET includes mass spectrometry systems manufactured by AB Sciex, such as the 5500 QTRAP, the 4000 QTRAP, and the 3200 QTRAP.

**ANSWER:** AB Sciex lacks information or knowledge sufficient to form a belief as to the truth of the allegations in ¶ 2, and therefore denies them.

## Paragraph No. 3

Generally speaking, mass spectrometers are highly specialized and sophisticated instruments which are used to determine the chemical composition and/or molecular structure of sample matter. These instruments are primarily used for drug discovery and development research, drug testing, pain management testing, as well as food and environmental safety testing and diagnostics. Typical purchasers of mass spectrometry equipment include pharmaceutical, biotechnology and biomedical companies, research and clinical institutions, and contract research organizations. Some organizations may have dozens of mass spectrometer instruments at their facilities.

**ANSWER:** The allegations in the first, second, and third sentences of ¶ 3 are overly generalized and simplistic, and AB Sciex therefore denies them. AB Sciex lacks information or

2

knowledge sufficient to form a belief as to the truth of the allegations in the last sentence of ¶ 3,

and therefore denies them.

### Paragraph No. 4

> Because AB Sciex sells its own equipment – both refurbished and new – it is a competitor of IET. However, because there are also repair and service elements to any sale or lease of AB Sciex's equipment, IET regularly brokers service contracts between AB Sciex and IET's customers, who often prefer or require the manufacturer (in this case, AB Sciex) to service the instruments that the customers purchase from IET.

**ANSWER:** AB Sciex admits that it sells its own equipment (both refurbished and new). The allegation that AB Sciex is a "competitor" of IET is a legal conclusion to which no response is required. To the extent a response is required, AB Sciex denies that allegation. AB Sciex denies the remaining allegations in ¶ 4.

### Paragraph No. 5

> Beginning in or around April 2008, and continuing up to and including the date of filing this Amended Complaint, AB Sciex has been engaged in a practice of threatening IET's customers with what it calls a $40,000 "site licensing fee" for the operating and data collection software necessary to operate its mass spectrometers once AB Sciex learns of a potential sale or lease by IET of one of AB Sciex's refurbished systems. AB Sciex, pursuant to its policy and practice, advises the customer that unless the customer buys or leases a new or used mass spectrometry system directly from AB Sciex, the software on the used instrument is subject to a "non-transferable" software license, and therefore, subject to a "site licensing fee." AB Sciex's practices have extended to other third-party resellers of AB Sciex's refurbished mass spectrometers besides IET.

**ANSWER:** AB Sciex denies the allegations in ¶ 5.

### Paragraph No. 6

> Despite AB Sciex's characterization of the operating and data collection software as being "licensed," AB Sciex actually sells the software as part of its sale of new mass spectrometry systems. The software is sold for a single, up-front payment with no recurring benefit to AB Sciex, and the "Software License Agreement"

accompanying such sales is of perpetual duration and never requires the purchasers of such software to return or destroy the software unless the agreement is terminated by AB Sciex.

**ANSWER:**   The "Software Licensing Agreement" referenced in ¶ 6 speaks for itself, and AB Sciex denies any characterization of that document.  AB Sciex denies the remaining allegations in ¶ 6.

### Paragraph No. 7

The "site licensing fee" is not, in reality, a mandatory fee and the threat of imposing the fee upon IET's customers is intended to kill the sale or lease between the customer and IET.  The amount of the fee, or whether to charge it at all, is discretionary on the part of AB Sciex's regional sales representative or service engineer, and both the imposition and the amount of the fee are arbitrary and solely intended to interfere with sales or leases of AB Sciex's own products on the secondary market.  For example, when it does charge a customer a "site licensing fee," sometimes AB Sciex will actually charge between $2,500-$4,000 for the software, and sometimes it will not charge a fee at all.  AB Sciex has repeatedly, however, threatened customers in the secondary market to charge the $40,000 licensing fee only with regard to mass spectrometry instruments purchased from third party resellers like IET.  Despite representing to customers that the $40,000 fee is the standard site license fee, upon information and belief, AB Sciex has never actually charged a customer the $40,000 fee.

**ANSWER:**   AB Sciex denies the allegations in ¶ 7.

### Paragraph No. 8

This "scare tactic" utilized by AB Sciex, insofar as it impacts IET's profits, typically has the effect of quelling IET's sale of a mass spectrometry system to the customer, sometimes in favor of a sale by AB Sciex itself.  In some instances, AB Sciex has also refused to service equipment purchased by a customer from IET or sell parts to that customer without what it deems to be a "proper" software license, refusing to recognize customers as "authorized users."  Further, AB Sciex has a practice of threatening to charge exorbitant markups for replacement parts – sometimes as much as 500% - to customers in order to coerce them into entering service contracts with AB Sciex or buying AB Sciex products directly.  Consumers in need of replacement parts have no choice but to give in to AB Sciex's threats because no other

4

manufacturer's replacement parts are compatible with AB Sciex machines or interchangeable with AB Sciex parts.

**ANSWER:**    AB Sciex denies the allegations in ¶ 8.

### Paragraph No. 9

By its predatory and discriminatory threats and conduct, AB Sciex has unlawfully attempted to create a monopoly within the secondary mass spectrometry market over its own mass spectrometry systems, or alternatively, within at least two sub-markets of mass spectrometers by effectively prohibiting the resale of its own products by IET or any other reseller, thereby eliminating, or attempting to eliminate, IET and other resellers of mass spectrometry instruments as competitors of AB Sciex.

**ANSWER:**    AB Sciex denies the allegations in ¶ 9.

### JURISDICTION, VENUE AND COMMERCE

### Paragraph No. 10

The jurisdiction of this Court is involved pursuant to 28 U.S.C. § 1331 and § 1337(a) because this action is brought pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26.

**ANSWER:**    Paragraph 10 states a legal conclusion to which no response is required.  To the extent a response is required, AB Sciex denies the allegations in ¶ 10.

### Paragraph No. 11

The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on diversity of citizenship:

a.      IET is an Illinois corporation with its principal place of business in Vernon Hills, Illinois.  Therefore, IET is a citizen of Illinois.

b.      AB Sciex enjoys dual citizenship with its place of incorporation in Delaware, and its principal place of business located in Foster City, California.  Robert Lutz of Washington, DC, and Charles Schwertner of Mayfield Heights, OH, are the members of AB Sciex.

c.      The amount in controversy exceeds $75,000, exclusive of interest and costs.

**ANSWER:**    The first sentence of ¶ 11 states legal conclusions to which no response is required.  To the extent a response is required, AB Sciex denies the allegations in the first sentence of ¶ 11.  AB Sciex lacks information or knowledge sufficient to form a belief as to the truth of the allegations in ¶ 11(a), and AB Sciex therefore denies them.  AB Sciex admits that AB Sciex is registered in Delaware.  The allegations in ¶ 11(b) regarding AB Sciex's principal place of business is a legal conclusion to which no response is required.  To the extent a response is required, AB Sciex denies the allegations regarding its principal place of business.  AB Sciex denies the remaining allegations in ¶ 11(b).  AB Sciex denies the allegations in ¶ 11(c).

### Paragraph No. 12

This Court also has supplemental jurisdiction over IET's state and common law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy and involve a common nucleus of operative fact.  The exercise of supplemental jurisdiction avoids unnecessary duplication and multiplicity of actions and is in the interests of judicial economy, convenience, and fairness.

**ANSWER:**    The allegations in ¶ 12 are legal conclusions to which no response is required.  To the extent a response is required, AB Sciex denies the allegations in ¶ 12

### Paragraph No. 13

Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this cause of action occurred in Lake County, Illinois, and because Defendants transact business within this district.  See also 28 U.S.C. § 93(a)(1) (Northern District of Illinois comprises Lake County).

**ANSWER:**    AB Sciex admits that it transacts business in the Northern District of Illinois.  The remainder of ¶ 13 states legal conclusions to which no response is required.  To the extent a response is required, AB Sciex denies the remainder of the allegations in ¶13.

## FACTS COMMON TO ALL COUNTS
### *History of AB Sciex*
### Paragraph No. 14

AB Sciex LLC was formerly known as "Applied Biosystems/MDS Sciex," and changed its name to AB Sciex LLC in January 2010. As of January 29, 2010, AB Sciex LLC operates as a wholly-owned subsidiary of The Danaher Corporation ("Danaher").

**ANSWER:**    AB Sciex denies the allegations in the first sentence of ¶ 14.  AB Sciex admits the

allegations in the second sentence of ¶14.

### Paragraph No. 15

Prior to January 2010, Applied Biosystems/MDS Sciex was a joint venture partnership between MDS Analytical Technologies, a business unit of MDS, Inc., and Applied Biosystems, a division of Life Technologies.  In 2009, Danaher became the owner of 100% of Applied Biosystems/MDS Sciex as follows: (1) by acquiring the Analytical Technologies business unit of MDS, Inc., which included a 50% ownership position in Applied Biosystems/MDS Sciex, and (2) in a separate but related transaction, by acquiring the other 50% of Applied Biosystems/MDS Sciex owned by Life Technologies.

**ANSWER:**    AB Sciex denies that Danaher became the owner of 100% of

Applied/Biosystems/MDS Sciex in 2009.  AB Sciex admits the remaining allegations in ¶15.

### Paragraph No. 16

A distinct market exists for used AB Sciex mass spectrometers. First, new and used mass spectrometers are not easily interchangeable with one another because of the enormous price differential between new and used instruments.  The difference in price between a new and used mass spectrometer of the same model can be up to several hundred thousand dollars.  For many consumers in the market for a used instrument, paying the premium price for a new instrument is simply not an alternative.[1]

---

[1] AB Sciex's own marketing materials recognize the existence of a sub-market for its own used equipment.  AB Sciex's website identifies "Refurbished and Used Mass Specs" as a separate category of "Mass Spec Products," and includes the following description: "We understand that sometimes you need a higher throughput or a more sensitive solution but don't have the budget for a new mass spectrometry system.  Our goal is to provide you with an industry leading LC/MS

**ANSWER:**     The allegations in the third sentence of ¶ 16 are overly generalized and simplistic, and AB Sciex therefore denies them.  AB Sciex denies the remaining allegations in the body of ¶ 16.  With respect to the footnote in ¶ 16, AB Sciex's website speaks for itself, and AB Sciex denies any characterization of the website.  AB Sciex denies the remaining allegations in the footnote in ¶ 16.

<u>**Paragraph No. 17**</u>

Further, the purchase of a mass spectrometer represents a significant investment for the purchaser.  In addition to the high purchase price and servicing costs, a purchaser of a mass spectrometer must invest significant amounts of time and resources into validating operating platforms and developing methods and procedures for use in particular applications.  The processes of platform validation and development of methodology for AB Sciex mass spectrometers involve steep learning curves, and cannot be transferred or applied to other manufacturers' mass spectrometers.  Thus, a consumer who has already established platforms and procedures for an AB Sciex mass spectrometer will find it very difficult to change to a different manufacturer, or to add a non-AB Sciex machine to their collection of mass spectrometers.  Additionally, many customers of contract research organizations insist that their samples be processed only by AB Sciex standardized equipment due, in large part, to their sensitivity.  Other customers require an AB Sciex machine because they have already developed their protocols on AB Sciex platforms.  For these organizations, use of another manufacturer's instruments is not an option.  Finally, replacement parts and servicing for AB Sciex mass spectrometers are not interchangeable with those of other manufacturers' machines.  Thus, consumers in the market for an AB Sciex mass spectrometer will not be able to easily substitute another manufacturer's instrument.

**ANSWER:**     The first and second sentences of ¶ 17 are overly generalized and simplistic, and AB Sciex therefore denies them.  AB Sciex denies the remaining allegations in ¶ 17.

---

system, at a price that meets your budget."  http://www.absciex.com/products/refurbished-and-used-mass-specs-available (last visited September 12, 2013).

### Paragraph No. 18

Alternatively, several submarkets exist within the broader market of mass spectrometers. Although the term "mass spectrometer" can be applied generally to a variety of instruments, several distinct types of mass spectrometers are designed for different purposes, such as quantitative vs. qualitative analysis. Further, different types of mass spectrometers vary greatly in their sensitivity or their ability to perform specific functions. Due to the high degree of specialization in these fields, a particular type of mass spectrometer typically is best suited to a particular purpose. Conversely, the wrong type of mass spectrometer may be ill-suited – or have no use whatsoever – to an application for which it was not designed to be used.

**ANSWER:** AB Sciex denies the allegations in the first sentence of ¶ 18. The remaining allegations in ¶ 18 are overly generalized and simplistic, and AB Sciex therefore denies them.

### Paragraph No. 19

The various types of mass spectrometers include Liquid Chromatography Single Quadrupole Mass Spectrometers (LC/MS), Liquid Chromatography Triple Quadrupole Mass Spectrometers (LC/MS/MS), Gas Chromatography Mass Spectrometers (GC/MS), Orbitraps, Time of Flight systems (TOF), and combined Triple Quadrupole LC/MS/MS Ion Trap Mass Spectrometers (LC/MS/MS/Ion Trap). AB Sciex has positioned itself as the dominant player in the market for LC/MS/MS Machines, and has achieved this position through continual expansion of its LC/MS/MS product lines since the late 1990's with increased sensitivity for each new model. As well, AB Sciex's LC/MS/MS mass spectrometers are some of the most sought after mass spectrometers in the world today because thousands of platforms have been standardized on these particular instruments. Further, in the vast majority of applications, LC/MS/MS instruments are not interchangeable with other types of mass spectrometers.

**ANSWER:** AB Sciex admits that the various types of mass spectrometer systems include those systems referenced in the first sentence of ¶ 19. AB Sciex denies the remaining allegations in ¶ 19.

### Paragraph No. 20

AB Sciex controls at least 50% of the market for new LC/MS/MS machines. Within the LC/MS/MS resale market, AB Sciex's share, on belief, approaches 95%.

**ANSWER:** AB Sciex denies the allegations in ¶ 20.

### Paragraph No. 21

LC/MS/MS mass spectrometers are best suited for particular applications such as quantitation, and are not interchangeable with other types of mass spectrometers. AB Sciex markets its LC/MS/MS mass spectrometers specifically for quantitation. Its LC/MS/MS machines include the API line and such models as the API 2000, API 3000, API 3200, API 4000, API 5000, API 4500, API 5500, API 6500.

**ANSWER:** AB Sciex denies the allegations in the first and second sentences of ¶ 21. AB Sciex admits that its LC/MS/MS systems include the API line and the models referenced in the third sentence of ¶ 21. AB Sciex denies the remaining allegations in ¶ 21.

### Paragraph No. 22

In addition, AB Sciex manufacturers a line of combination Liquid Chromatography Triple Quadrupole LC/MS/MS Ion Trap Spectrometers (LC/MS/MS/Ion Trap). AB Sciex is the only manufacturer of LC/MS/MS/Ion Trap machines. Thus, AB Sciex dominates the LC/MS/MS/Ion Trap market, owning 100% of the market for new machines, and 95% of the secondary market for these machines. The LC/MS/MS/Ion Trap offers additional sensitivity required for materials not detected by the Triple Quad (LC/MS/MS) mass spectrometers. For certain applications such as low detection metabolites, it is necessary to utilize both the Ion Trap and the Triple Quad technologies at the same time. For certain applications and certain customers, there is no substitute for an AB Sciex combined LC/MS/MS/Ion Trap mass spectrometer, which machines include the QTRAP 3200, QTRAP 4000, QTRAP 4500, QTRAP 5500, and QTRAP 6500 models. Indeed, AB Sciex describes its line of LC/MS/MS/Ion Trap mass spectrometers (the "QTRAP") as "unique."[2]

---

[2] http://www.absciex.com/products/mass-spectrometers/qtrap-lcms-systems (last visited September 12, 2013)

**ANSWER:**     AB Sciex admits that it manufactures MS/MS Ion Trap mass spectrometers.  AB Sciex denies the allegations in the second, third, and sixth sentences of ¶ 22.  The allegations in the fourth and fifth sentences of ¶ 22 are overly generalized and simplistic, and AB Sciex therefore denies them.  With respect to the last sentence of ¶ 22 and the accompanying footnote, AB Sciex's website speaks for itself, and AB Sciex denies any characterization of that website. AB Sciex denies the remaining allegations in ¶ 22.

### *Lost Sales Regarding Instruments Expressly Exempt From Licensing Fees*

### Paragraph No. 23

On or about September 24, 2009, AB Sciex entered into a certain "Consent to Transfer and Assignment of Licenses to Certain AB Software" letter agreement ("DLL Agreement") with De Lage Landen Financial Services, Inc. ("DLL"), who provides lease or other financing of AB Sciex instruments and systems, many of which were sold to DLL by AB Sciex.  On information and belief, these parties entered into a similar agreement covering the period 2008-2009, as well as for 2010 to date.    In the DLL Agreement, AB Sciex expressly acknowledged that DLL "often engages third party resellers to sell the formerly leased/financed AB instruments" (e.g., in the event of a lease default), including IET, and that it consents to the transfer by the resellers to their end-user customers of the software loaded on those instruments.   Notwithstanding this clear and express exemption, AB Sciex has repeatedly attempted to interfere with sales by threatening IET's customers with a "site licensing fee" in at least the following instances involving mass spectrometry instruments AB Sciex knew to be exempt from licensing fees:

a.      In or around the late Fall 2009, in connection with a sale of a 4000 QTRAP Eurofins Central Analytical Laboratories ("Eurofins"), which instrument was originally sold by AB Sciex to Epix Pharmaceutical Inc. in Lexington, MA.  Although Eurofins has previously issued a purchase order to IET dated October 29, 2009 for a purchase price of $206,625, AB Sciex's tactics caused Eurofins to withdraw their purchase offer to IET.

b.      In or about the early Spring 2011, in connection with the sale of a refurbished API 3200 to Sundream Environmental Technologies Corp. in Taiwan, having a purchase price of

approximately $92,000. Initially, AB Sciex's Taiwan office attempted to quell the sale, until it was advised by its US counterpart that the system was exempt under the DLL Agreement. Because the customer would not proceed with the purchase until the site licensing fee issue was resolved, by the time AB Sciex acknowledged the exemption months later, the system had already been sold to another customer.

c.     In or about February or early March 2013, in connection with the sale of a refurbished API 4000 LC/MS/MS to Axys Analytical for a purchase price of $130,000, even though IET's quoted price was lower than the amount the customer ultimately paid to AB Sciex. The customer indicated that they purchased directly from AB Sciex because they were "offered a very good deal on licensing."

**ANSWER:**     AB Sciex admits that AB Sciex sold equipment to De Lage Landen Financial Services ("DLL") and that DLL leased or provided other financing of AB Sciex equipment. The remainder of the first sentence of ¶ 23 refers to the DLL Agreement, which is a written document that speaks for itself, and AB Sciex denies any characterization of the document. AB Sciex admits that it entered into agreements with DLL, but states that the agreements are written documents that speak for themselves, and AB Sciex denies any characterization of those agreements. The third sentence of ¶ 23 refers to the "DLL Agreement," which is a written document that speaks for itself, and AB Sciex denies any characterization of the document. AB Sciex denies the allegations in the fourth sentence of ¶ 23. AB Sciex lacks information or knowledge sufficient to form a belief as to the truth of the allegations in the subparts of ¶ 23 regarding purchase orders and the prices quoted by IET, and AB Sciex therefore denies them. AB Sciex denies the remaining allegations in ¶ 23 and its subparts.

### *Additional Actual Lost Sales Resulting From AB Sciex's Predatory Conduct*

### Paragraph No. 24

In addition to the forgoing lost sales of "exempt" instruments pursuant to the DLL Agreement, AB Sciex's predatory conduct has also resulted in at least the following lost sales:

a.      In or around June 2010, in connection with the sale of a 3200 QTRAP to the University of Kentucky College of Medicine, for which IET had quoted a purchase price of approximately $100,000.

b.      In or around October 2010, in connection with the sale of a QTRAP 4000 to FDA Laboratories in Pretoria, South Africa, for which IET had quoted a purchase price of approximately $180,000-$200,000.

c.      In or around February 2011, in connection with the sale of a refurbished 4000 QTRAP to the National Pain Institute in Florida, for which IET quoted a purchase price of $167,500 for a 2007 system, and $175,000 for a 2008 system. The customer had a budget of $140,000, which IET would have been willing and able to accommodate but for the $40,000 site licensing fee threatened by AB Sciex.

d.      In or around March 2011, in connection with the sale of a refurbished API 3200 to Sundream Environmental Technologies Corp. in Taiwan, which IET had acquired from Bellus Pharmaceuticals in Canada. IET had quoted the customer a purchase price of $83,000 without installation, and $93,000 with installation. The customer declined to purchase the instrument and IET lost the sale because AB Sciex's Taiwan office told the customer it would neither service the instrument nor sell the customer any parts for the system, unless the customer either (a) paid the $40,000 site licensing fee, or (b) bought the instrument directly from AB Sciex.

e.      In or around June 2011, in connection with the sale of an API 3200 to Mount Sinai Services in Toronto, Canada, for which IET had quoted a purchase price of approximately $100,000.

f.      In or around June 2011, in connection with the sale of a 4000 QTRAP to New York Medical College, for which IET had quoted a purchase price of approximately $185,000.

g.      In or around November 2011, in connection with the sale of a new 5500 QTRAP to VCU School of Medicine, for which IET had quoted a purchase price of approximately $410,000.

h.      In or around January 2012, in connection with the sale of a QTRAP 5500 to Pace Analytical in Minneapolis, Minnesota, for which IET had quoted a purchase price of approximately $275,000.

i.      In or around June 2012, in connection with the sale of a 5500 QTRAP to Philip Dimson of Speware Corp., for which IET had quoted a purchase price of $265,000.

j.      In or around June 2012, in connection with the sale of a 5500 QTRAP to Certified Laboratories in Bollingbrook, Illinois, for which IET had quoted a purchase price of $250,000.

k.      In or around December 2012, in connection with the sale of an API 4800 to Michael D. Scholle of SAMDI Tech, Inc. in Chicago, Illinois, for which IET had quoted a purchase price of $160,000.

l.      In or around January 2013, in connection with the sale of a refurbished API 5500 to Critical Path Services, LLC in Garnet Valley, Pennsylvania, for which IET had quoted a purchase price of $225,000.

**ANSWER:**     AB Sciex lacks information or knowledge sufficient to form a belief as to the truth of the allegations in ¶ 24 and its subparts regarding the National Pain Institute's budget and the prices quoted by IET, and AB Sciex therefore denies them.  AB Sciex denies the remaining allegations in ¶ 24 and its subparts.

### *AB Sciex's Attempted Interference With IET's Sales*

### Paragraph No. 25

Using its scare tactics directed to IET's customers, AB Sciex has interfered with at least the following transactions:

a.      In or around August 2008, in connection with a refurbished API 2000 to the United States Air Force, despite that the instrument itself was priced at only $35,000.  Once AB Sciex learned that IET acquired the instrument on trade from MDS, Inc. at Toronto Hospital to finance the sale of a different mass spectrometer manufactured by AB Sciex, AB Sciex ultimately agreed to reduce the site license fee to $2,500.

b.      In or around March/April 2010, in connection with the potential sale of an API 3000 by IET to Dr. Andrew Pugh, an independent research analyst from British Columbia, Canada.

c.      In or around March 2011, in connection with the lease of a refurbished API 3200 LC/MS/MS to Marta Ortega-Valle of GreenLight Biosciences in Medford, Massachusetts.

14

   d. In or around February and March 2012, in connection with the sale of a 4000 QTRAP to Dr. Howard of Advanced Drug Testing, Inc./MedScan Laboratory, Inc. in Williston, North Dakota, which resulted in IET's extension of a $50,000 price reduction to the customer to account for AB Sciex's threatened $40,000 site licensing fee.

   e. In or around March 2012, in connection with IET's sale of a 5500 QTRAP to Dr. Luigi Silvestro of Pharma Serv. International SRL in Bucharest, Romania.

   f. In or around January 2013, in connection with the sale of a 4000 QTRAP to Muzzio Miguel of IIT Research Institute in Chicago, Illinois.

   g. In or around February 2013, in connection with the sale of an API 5500 QTRAP to Sunovion Pharmaceuticals, Inc. in Boston, Massachusetts.

**ANSWER:** AB Sciex lacks information or knowledge sufficient to form a belief as to the truth of the allegations in ¶ 25 and its subparts regarding the prices quoted by IET, and AB Sciex therefore denies them. AB Sciex denies the remaining allegations in ¶ 25 and its subparts.

**COUNT I**
**Violation of § 2 of Sherman Act**
**(15 U.S.C. § 2 – Attempted Monopolization)**

**Paragraph No. 26**

IET realleges Paragraphs 1-9 and 14-25 as Paragraph 26 of this Count I, as though fully set forth herein.

**ANSWER:** AB Sciex incorporates by reference its responses to ¶¶ 1-9 and 14-25 above as if fully set forth herein.

**Paragraph No. 27**

Section 2 of the Sherman Act provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding

> $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court. 15 U.S.C. § 2.

**ANSWER:**     The legislation to which ¶ 27 refers speaks for itself, and AB Sciex refers to the content of such legislation and denies any allegations inconsistent therewith.

### Paragraph No. 28

> AB Sciex's mass spectrometry systems are marketed to and sold to customers located within the State of Illinois, throughout the United States, and the world. Therefore, AB Sciex's conduct substantially affects interstate and foreign commerce.

**ANSWER:**     AB Sciex admits the allegations in the first sentence of ¶ 28. The second sentence of ¶ 28 states a legal conclusion to which no response is required. To the extent a response is required, AB Sciex denies the allegations in the second sentence of ¶ 28.

### Paragraph No. 29

> The market for used AB Sciex mass spectrometers constitutes a distinct sub-market for mass spectrometry instruments. As compared with other manufacturers' machines (new or used), used AB Sciex mass spectrometers are not easily interchangeable, and there is a very low cross-elasticity of demand between AB Sciex machines and those of its competitors. Further, the prohibitively high cost of a new mass spectrometers places used AB Sciex machines in their own sub-market.

**ANSWER:**     AB Sciex denies the allegations in ¶ 29.

### Paragraph No. 30

> Alternatively, one or more of the following constitute distinct markets for mass spectrometry instruments:
>
> a.      All used Liquid Chromatography Triple Quadrupole Mass Spectrometers (Triple Quad LC/MS/MS); and
>
> b.      AB Sciex used combination Liquid Chromatography Triple Quadrupole plus Ion Trap mass spectrometers (LC/MS/MS/Ion Trap).

**ANSWER:**     AB Sciex denies the allegations in ¶ 30 and its subparts.

16

### Paragraph No. 31

As compared with other types of mass spectrometers or with each other, the used LC/MS/MS and combined LC/MS/MS/Ion Trap mass spectrometers are not substitutable, and there is a very low cross-elasticity of demand. Further, the prohibitively high cost of new LC/MS/MS and combined LC/MS/MS/Ion Trap mass spectrometers places used machines of both of these types in their own sub-market.

**ANSWER:** AB Sciex denies the allegations in ¶ 31.

### Paragraph No. 32

In violation of Section 2 of the Sherman Act (15 U.S.C. § 2), AB Sciex engaged in the forgoing anticompetitive conduct in an attempt to monopolize one or more of the above used mass spectrometry markets by attempting to eliminate competition from third-party resellers like IET. Such violations began in 2008, are continuing up to and including the date of filing this Amended Complaint, and will continue unless the relief prayed for is granted.

**ANSWER:** AB Sciex denies the allegations in ¶ 32.

### Paragraph No. 33

By virtue of the above conduct, AB Sciex has demonstrated the specific intent to destroy competition or build a monopoly over the foregoing secondary mass spectrometry markets. Further, certain AB Sciex sales representatives have expressly indicated verbally to IET (a) that AB Sciex has never actually imposed a licensing fee for the threatened amount of $40,000, and (b) that the licensing fee is within the discretion of the local salesperson. AB Sciex has also directed its anticompetitive conduct toward other third-party resellers besides IET, including Zef Scientific Inc. in Montreal, Canada.

**ANSWER:** AB Sciex lacks information or knowledge sufficient to form a belief as to the truth of the allegations in the second sentence of ¶ 33, and AB Sciex therefore denies them. AB Sciex denies the remaining allegations in ¶ 33.

### Paragraph No. 34

AB Sciex's practice of threatening IET's customers with a $40,000 "site-licensing fee" constitutes predatory and anticompetitive conduct. AB Sciex's threats are false statements because: (1) as

17

set forth in Count VII herein, the first sale doctrine prohibited AB Sciex from imposing the fee, (2) AB Sciex was contractually prohibited from imposing the fee in certain instances under the DLL Agreement, and (3) the "licensing fee" was illusory in that AB Sciex never actually charged the fee in practice, or only charged a nominal fee. Instead, AB Sciex uses these threats as a way to drive IET and other third-party resellers from the foregoing mass spectrometry markets and thereby strengthen its dominant position within these markets. AB Sciex employs coercive mechanisms in tandem with its threats, including its refusal to service used equipment purchased through third-party resellers like IET, imposing exorbitant markups on replacement parts to consumers who purchase mass spectrometers from third-party resellers like IET or who do not enter into service contracts with AB Sciex, and leveraging its inherent authority as the self-described "industry leader" to coerce sales away from third-party resellers like IET.

**ANSWER:**    AB Sciex denies the allegations in ¶ 34.

**Paragraph No. 35**

Having fewer than five competitors world-wide who also manufacture mass spectrometers, AB Sciex maintains substantial market power in the mass spectrometer industry generally, as well as in the secondary resale market of its own mass spectrometers, and in the submarkets for LC/MS/MS and combined LC/MS/MS/Ion Trap mass spectrometers. Indeed, AB Sciex has been touted by the President and CEO of Danaher Corporation, its parent company, as "the market leader in mass spectrometry."

**ANSWER:**    AB Sciex denies the allegations in the first sentence of ¶ 35. The purported statements of Danaher's President and CEO referenced in the second sentence of ¶ 35 speak for themselves, and AB Sciex denies any characterization of them. AB Sciex denies the remaining allegations in ¶ 35.

**Paragraph No. 36**

IET is one of fewer than ten companies in the United States and Canada who sell AB Sciex's mass spectrometers in the secondary markets. Given (a) AB Sciex's substantial position in the market for used AB Sciex mass spectrometers, or alternatively, within the submarkets LC/MS/MS and combined LC/MS/MS/Ion Trap mass spectrometers, and (b) the breadth of adoption and expansion of its anticompetitive policies by its various sales representatives

throughout the United States and internationally, a dangerous probability exists that its attempts to monopolize the secondary mass spectrometry markets will succeed.

**ANSWER:** AB Sciex lacks information or knowledge sufficient to form a belief as to the allegations in the first sentence of ¶ 36, and AB Sciex therefore denies them. AB Sciex denies the remaining allegations in ¶ 36.

### Paragraph No. 37

If AB Sciex is successful in monopolizing the foregoing mass spectrometry markets, competition will be harmed because AB Sciex will (a) be able to inflate the price of used mass spectrometers in the relevant markets, and/or (b) artificially reduce the supply of used mass spectrometers. For example, some of AB Sciex's older systems such as API 3000 or API 2000 are only worth $30,000 and $20,000, respectively, and AB Sciex tries to impose a $40,000.00 "licensing fee" essentially making it impossible for anybody to sell them other than themselves.

**ANSWER:** AB Sciex denies the allegations in ¶ 37.

### COUNT II
### Violation of §§ 4 and 16 of Clayton Act
### (15 U.S.C. §§ 15(a), 26)

### Paragraph No. 38

IET realleges Paragraphs 1-9, 14-25 and 27-37 as Paragraph 38 of this Count II, as though fully set forth herein.

**ANSWER:** AB Sciex incorporates by reference its responses to ¶¶ 1-9, 14-25, and 27-37 above as if fully set forth herein.

### Paragraph No. 39

Section 4 of the Clayton Act provides, in relevant part:

"… any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a).

19

**ANSWER:**     The legislation to which ¶ 39 refers speaks for itself, and AB Sciex refers to the

content of such legislation and denies any allegations inconsistent therewith.

### Paragraph No. 40

Moreover, Section 16 of the Clayton Act provides, in relevant part:

"Any…corporation…shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws…".  15 U.S.C. § 26.

**ANSWER:**     The legislation to which ¶ 40 refers speaks for itself, and AB Sciex refers to the

content of such legislation and denies any allegations inconsistent therewith.

### Paragraph No. 41

Thus, AB Sciex's actual and threatened violations of § 2 of the Sherman Act, as alleged in Count I herein, establishes a private right of action for IET and entitles IET to relief under Sections 4 and 16 of the Clayton Act, respectively, in the form of treble compensatory damages, costs, attorneys' fees, prejudgment interest (15 U.S.C. § 15(a)) and injunctive relief (15 U.S.C. § 26).

**ANSWER:**     AB Sciex denies the allegations in ¶ 41.

### COUNT III
### Violation of Illinois Consumer Fraud and Deceptive Business Practices Act
### (815 ILCS 505/1 *et seq.*)

### Paragraph No. 42

IET realleges Paragraphs 1-9, 14-25 and 27-37 as Paragraph 42 of this Count III, as though fully set forth herein.

**ANSWER:**     AB Sciex incorporates by reference its responses to ¶¶ 1-9, 14-25, and 27-37

above as if fully set forth herein.

### Paragraph No. 43

Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois Consumer Fraud Act") provides, in relevant part:

20

"Unfair methods of competition and unfair or deceptive acts or practices…or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act"…in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."  815 ILCS 505/2.

**ANSWER:**    The legislation to which ¶ 43 refers speaks for itself, and AB Sciex refers to the

content of such legislation and denies any allegations inconsistent therewith.

### Paragraph No. 44

AB Sciex violated the Illinois Consumer Fraud Act by engaging in the conduct described herein including, but not limited to, misrepresenting the true nature of the site license, calculated solely to deceive consumers into purchasing its mass spectrometers on the secondary market from AB Sciex, as opposed to IET or one of its other competitors.

**ANSWER:**    AB Sciex denies the allegations in ¶ 44.

### Paragraph No. 45

AB Sciex's deceptive and unfair conduct occurred in the course of conduct involving the trade and commerce of mass spectrometry sales on the secondary market, and substantially affects consumers, including Illinois consumers, and consumer protection concerns.

**ANSWER:**    AB Sciex denies the allegations in ¶ 45.

### Paragraph No. 46

Through its deceptive and unfair conduct, AB Sciex has directly and/or indirectly harmed consumers, including Illinois consumers, by affecting competition generally, and by eliminating the advantages available to consumers where competition is fostered, including, but not limited to the consumers' ability to purchase product on the secondary market from the seller who they believed would provide the best prices and best services.  AB Sciex's deceptive and unfair conduct has also resulted in damage to IET in the form of lost profits, as alleged herein.

**ANSWER:**    AB Sciex denies the allegations in ¶ 46.

### Paragraph No. 47

AB Sciex's willful violations of the Illinois Consumer Fraud Act, as alleged herein, entitles IET to relief in the form of compensatory

damages, costs, attorneys' fees, punitive damages, and injunctive relief under Section 10a of the Act.

**ANSWER:**     AB Sciex denies the allegations in ¶ 47.

**COUNT IV**
**Violation of Illinois Uniform Deceptive Trade Practices Act**
**(815 ILCS 510/1 *et seq.*)**

**Paragraph No. 48**

IET realleges Paragraphs 1-9, 14-25 and 27-37 as Paragraph 48 of this Count IV, as though fully set forth herein.

**ANSWER:**     AB Sciex incorporates by reference its responses to ¶¶ 1-9, 14-25, and 27-37

above as if fully set forth herein.

**Paragraph No. 49**

Section 2 of the Uniform Deceptive Trade Practices Act ("DTPA") provides, in relevant part:

(a)     A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:

***

(11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

(12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

**ANSWER:**     The legislation to which ¶ 49 refers speaks for itself, and AB Sciex refers to the

content of such legislation and denies any allegations inconsistent therewith.

**Paragraph No. 50**

AB Sciex violated Section 2 of the DTPA by willfully engaging in the deceptive trade practices enumerated herein, entitling IET to injunctive relief, costs and reasonable attorneys' fees.

**ANSWER:**     AB Sciex denies the allegations in ¶ 50.

22

### COUNT V
### Violation of Illinois Antitrust Act
### (740 ILCS 10/1 *et seq*.)

### Paragraph No. 51

IET realleges Paragraphs 1-9, 14-25 and 27-37 as Paragraph 51 of this Count V, as though fully set forth herein.

**ANSWER:** AB Sciex incorporates by reference its responses to ¶¶ 1-9, 14-25, and 27-37 above as if fully set forth herein.

### Paragraph No. 52

Section 10/3(a)(3) of the Illinois Antitrust Act provides that "Every person shall be deemed to have committed a violation of this Act who shall...[e]stablish, maintain, use, or attempt to acquire monopoly power over any substantial part of trade or commerce of this State for the purpose of excluding competition...in such trade or commerce." 740 ILCS 10/3(3).

**ANSWER:** The legislation to which ¶ 52 refers speaks for itself, and AB Sciex refers to the content of such legislation and denies any allegations inconsistent therewith.

### Paragraph No. 53

AB Sciex violated the Illinois Antitrust Act by engaging in the conduct alleged herein, resulting in damage to IET and entitling it to compensatory damages, costs, attorneys' fees, and injunctive relief under Section 7 of the Act.

**ANSWER:** AB Sciex denies the allegations in ¶ 53.

### COUNT VI

### Intentional Interference with a Prospective Economic Advantage

### Paragraph No. 54

IET realleges Paragraphs 1-9, 14-25 and 27-37 as Paragraph 54 of this Count VI, as though fully set forth herein.

**ANSWER:** AB Sciex incorporates by reference its responses to ¶¶ 1-9, 14-25, and 27-37 above as if fully set forth herein.

23

## Paragraph No. 55

AB Sciex knew that IET had a reasonable expectancy of completing sales and/or leases of the refurbished mass spectrometers to those customers specified herein.

**ANSWER:**    AB Sciex denies the allegations in ¶ 55.

## Paragraph No. 56

AB Sciex nevertheless intentionally, maliciously and without justification acted with the purpose of interfering with IET's reasonable prospective economic advantage, resulting in damage to IET and entitling it to compensatory damages and injunctive relief.

**ANSWER:**    AB Sciex denies the allegations in ¶ 56.

## COUNT VII
## Declaratory Judgment Under 28 U.S.C. §2201(a)

## Paragraph No. 57

IET realleges Paragraphs 1-9, 14-25 and 27-37 as Paragraph 57 of this Count VII, as though fully set forth herein.

**ANSWER:**    AB Sciex incorporates by reference its responses to ¶¶ 1-9, 14-25, and 27-37

above as if fully set forth herein.

## Paragraph No. 58

Pursuant to 17 U.S.C §109(a), "the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord."

**ANSWER:**    The legislation to which ¶ 58 refers speaks for itself, and AB Sciex refers to the

content of such legislation and denies any allegations inconsistent therewith.

## Paragraph No. 59

The operating and data collection software which is the subject of AB Sciex's threatened "site licensing fee" are copies lawfully made under Title 17, and are owned by third parties from whom IET sources mass spectrometry equipment.

**ANSWER:**    AB Sciex denies the allegations in ¶ 59.

### Paragraph No. 60

When AB Sciex sells new mass spectrometers to its customers, such sales include, as part of the purchase price, a sale of the operating and data collection software. Such sales consist of a single, up-front payment to AB Sciex with no further payments or other recurring benefit to AB Sciex. The software agreements accompanying such sales are of perpetual duration and never require the purchaser to return or destroy the software unless the agreement is terminated by AB Sciex. (A true and correct copy of a sample AB Sciex "License Agreement" is attached hereto and incorporated herein as <u>Exhibit A</u>). As such, and notwithstanding that AB Sciex has characterized its software as being "licensed," including in Exhibit A and in the DDL Agreement, the initial transfer of AB Sciex's operating and data collection software to its customers constitutes a "sale" for the purposes of 17 U.S.C. §109, and the purchasers of such software are "owners" of lawfully made copies.

**ANSWER:**     The "License Agreement" and Exhibit A referenced in ¶ 60 speak for themselves, and AB Sciex denies any characterization of these documents. AB Sciex denies the remaining allegations in ¶ 60.

### Paragraph No. 61

Pursuant to 17 U.S.C. §109(a), any such "owner" of the operating and data collection software is entitled to sell or otherwise dispose of its copy without the authority of AB Sciex.

**ANSWER:**     The legislation to which ¶ 61 refers speaks for itself, and AB Sciex refers to the content of such legislation and denies any allegations inconsistent therewith.

### Paragraph No. 62

By threatening IET's customers with excessive "site licensing fees" for the operating and data collection software and otherwise interfering with IET's sales, including without limitation AB Sciex's refusal to service mass spectrometers without what it deems to be a "proper" software license, AB Sciex has caused IET to lose sales of mass spectrometers it otherwise would have been able to make. If AB Sciex is allowed to continue in its course of conduct, IET will continue to lose sales of mass spectrometers it otherwise would be able to make.

**ANSWER:**     AB Sciex denies the allegations in ¶ 62.

25

### Paragraph No. 63

The Declaratory Judgment Act provides as follows:

In a case of actual controversy within its jurisdiction…any court of the United States…may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C §2201(a)

**ANSWER:** The legislation to which ¶ 63 refers speaks for itself, and AB Sciex refers to the

content of such legislation and denies any allegations inconsistent therewith.

### Paragraph No. 64

A real and actual controversy exists between IET and AB Sciex as to whether AB Sciex may charge or threaten to charge a "site licensing fee" to customers purchasing AB Sciex mass spectrometers from IET.

**ANSWER:** Paragraph 64 states a legal conclusion to which no response is required. To the

extent a response is required, AB Sciex denies the allegations in ¶ 64.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff International Equipment Trading, Ltd. respectfully requests that the Court enter judgment in its favor and against Defendant AB Sciex LLC as follows:

A. Declaring that Defendant violated and is in violation of the Sherman Act § 2, the Clayton Act §§ 4 and 16, the Illinois Consumer Fraud and Deceptive Business Practices Act, and the Illinois Uniform Deceptive Trade Practices Act, the Illinois Antitrust Act, and that it tortuously interfered with Plaintiff's business expectancy as alleged herein;

B. Awarding Plaintiff treble compensatory damages sustained by Plaintiff as a result of Defendant's actions, including lost profits, together with prejudgment interest thereon;

C. Ordering injunctive relief preventing and enjoining Defendant and all persons acting on its behalf from engaging in the predatory and unlawful practices alleged herein;

26

      D.      Awarding Plaintiff the costs, expenses, and reasonable attorneys' fees and experts' fees for bringing and prosecuting this action;

      E.      Declaring that IET's brokering of the sale of AB Sciex's operating and data collection software to its customers is protected by 17 U.S.C. §109, and does not infringe on AB Sciex's copyrights or other rights, and therefore that AB Sciex has no right to charge or threaten to charge a "site licensing fee" to IET's customers or otherwise interfere with IET's brokering of authentic, used copies of AB Sciex's software; and

      F.      Ordering such other and further relief as the Court deems just and proper.

**ANSWER:** The "WHEREFORE" paragraph following ¶ 64 of the Amended Complaint contains Plaintiff's prayer for relief, to which no response is required. To the extent a response is required, AB Sciex denies that Plaintiff is entitled to any relief whatsoever, including but not limited to the relief requested in the Amended Complaint.

AB Sciex denies all allegations of the Amended Complaint that are not specifically admitted herein and denies that Plaintiff is entitled to any of the relief requested in the Prayer for Relief and elsewhere throughout the Amended Complaint.

* * *

AB Sciex sets forth the following affirmative and other defenses. AB Sciex does not hereby intend to assume the burden of pleading or proof with respect to those matters as to which, pursuant to law, Plaintiff bears the burden.

## FIRST AFFIRMATIVE DEFENSE

Plaintiff alleges that AB Sciex made misrepresentations and deceived consumers, but fails to plead fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.

27

**SECOND AFFIRMATIVE DEFENSE**

Count VII of Plaintiff's Amended Complaint is barred for lack of subject matter jurisdiction. AB Sciex has not made any claims against IET regarding its brokering the sale of AB Sciex software. Therefore, there is no controversy of sufficient immediacy between IET and AB Sciex regarding the software, and any declaration by the Court would amount to an improper opinion advising what the law would be upon a hypothetical state of facts. Plaintiff also is not entitled to a declaratory judgment because the first sale doctrine does not apply. AB Sciex licenses, not sells, the operating software alleged in the Amended Complaint through a licensing agreement that (1) specifies that the user is granted a license, (2) significantly restricts the user's ability to transfer the software, and (3) imposes notable use restrictions. *See* Ex. A to Am. Compl.

**<u>JURY DEMAND</u>**

Defendant AB Sciex hereby demands a trial by jury as to all matters so triable.

Dated:  October 16, 2013                              Respectfully submitted,


                                                      /s/ Frederic R. Klein
                                                      Frederic R. Klein
                                                      Kerry D. Nelson
                                                      GOLDBERG KOHN LTD.
                                                      55 East Monroe, Ste. 3300
                                                      Chicago, IL 60603
                                                      Tel.: (312) 201-4000

                                                      John E. Schmidtlein
                                                      Greg S. Hillson
                                                      WILLIAMS & CONNOLLY LLP
                                                      725 12th Street, N.W.
                                                      Washington, DC 20005
                                                      Tel.: (202) 434-5000

                                                      *Attorneys for Defendant AB Sciex LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of October 2013, I caused to be served via the Court's ECF system, a true and correct copy of the foregoing **AMENDED ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANT AB SCIEX TO PLAINTIFF'S AMENDED COMPLAINT** on all counsel of record registered through that system to receive electronic filings in this case.

/s/ Frederic R. Klein